NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 5, 2026

S25A1153. BYRD v. THE STATE.

LaGrua, Justice.

Appellant Tommy Joe Byrd appeals his conviction for felony murder related to the stabbing death of Jerold Bowden.[1] On appeal, Byrd argues that his conviction should be reversed because the trial court abused its discretion by refusing to declare a mistrial after one of the State's witnesses testified that Byrd had been in prison. For the reasons that follow, we affirm Byrd's conviction and sentence.

---

[1] Bowden died from his injuries on May 4, 2020. On October 20, 2020, a Morgan County grand jury indicted Byrd for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); and aggravated assault (Count 3). Byrd was tried from June 28 to July 2, 2021, and the jury found him not guilty of malice murder but guilty of felony murder and aggravated assault. The trial court sentenced Byrd to life without the possibility of parole on Count 2 (felony murder) and merged the aggravated assault count with the felony murder conviction. Byrd filed a timely motion for new trial, which he later amended through new counsel on October 11, 2024. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on December 20, 2024. Byrd filed a timely notice of appeal on January 11, 2025. The case was docketed in this Court to the August 2025 term and submitted for a decision on the briefs.

The evidence presented at trial demonstrates that, around 3:00 a.m. on May 4, 2020, deputies with the Walton County Sheriff's Office were called to a residence in Monroe owned by Mary Cooper, Bowden's niece. When the deputies arrived at Cooper's address, Cooper was outside, and she explained that she had discovered Bowden's body in her driveway after a passing motorist rang her doorbell and advised that a man was lying face-down in the driveway with his feet partially in the roadway. The deputies observed Bowden's body in that location and noted that Bowden had blood stains on his shirt. Emergency medical services soon arrived and determined that Bowden was deceased and had sustained severe injuries in his abdomen and back. The medical examiner testified that Bowden's cause of death was "[s]tab wounds of [the] torso"; specifically, a three-inch-deep stab wound to the abdomen, which punctured his liver, as well as a two-and-a-half-inch-deep stab wound to the back, which injured his aorta.

As deputies processed the scene, they observed very little blood in the area around Bowden's body. They also noted that gravel from

the driveway was inside Bowden's mouth, on the front of his clothes, and in his pockets, indicating that his injuries happened "at another location" and the body had been moved. "[B]lack tire marks" were also visible in the roadway beside Cooper's driveway. Over the next few hours, investigators learned that there had been an incident the night before in Morgan County involving Bowden and several of his friends. At that point, the investigation was turned over to the Morgan County Sheriff's Office and GBI agents in the Morgan County area.

According to several witnesses, on the night of May 3, 2020, Bowden and his girlfriend Carolyn Byrd, Appellant Byrd's sister, were hanging out at Bowden's "R.V. trailer," which was located in the yard behind Cooper's house and which was where Bowden resided. Byrd and his girlfriend Delores Malcolm, who lived together in Athens, came over to Bowden's home that night, as did Tommy Roger Byrd, Appellant Byrd's brother. Sometime after midnight, the group left Bowden's home in Monroe and traveled in two cars to Madison to pick up Laurie Crutchfield, Tommy Roger's girlfriend.

After picking up Crutchfield in Madison, the group started traveling back to Monroe. Byrd was driving his green Honda Accord, with Malcolm and Crutchfield as passengers. Carolyn was driving Tommy Roger's truck, with Bowden and Tommy Roger as passengers. On the way to Monroe, Byrd missed a turn, and he quickly turned the Honda around, causing the car to run into an embankment and knock off one of the bumpers. Byrd maneuvered the car back onto the roadway and drove a short distance before pulling over. Carolyn pulled the truck over behind the Honda.

Carolyn got out of the truck and went to the Honda to check on Byrd, Malcolm, and Crutchfield. Tommy Roger and Bowden also exited the truck, and Bowden, who had been drinking, was cursing and holding a pocketknife.[2] Tommy Roger and Bowden started arguing, and Byrd approached them and joined in the argument, at which point Bowden gestured at Byrd with the tip of the

---

[2] Investigators later recovered a pocketknife on the side of the road in this area. Subsequent testing did not reveal the presence of any fingerprints or blood on the pocketknife.

pocketknife.[3] Byrd returned to the Honda and retrieved a knife from inside the car. Byrd walked back to the area next to the truck. Bowden started running away and fell to the ground. Byrd approached Bowden and stabbed him twice while he was on the ground.

Shortly thereafter, Charles Robuck, who was driving through the area, saw a green Honda "stopped in the middle of the road" and "two guys trying to get up another guy off the ground." Robuck pulled over and approached the men. He noticed that the man being assisted—later identified as Bowden—had an injury to the lower part of his stomach with what "looked like guts" coming from the wound. Robuck helped Byrd get Bowden into the backseat of the Honda, and Byrd quickly drove away with Malcolm in the front seat and Carolyn in the backseat with Bowden. Tommy Roger and Crutchfield left the scene in his truck, and Crutchfield called 911 to

_____

[3] Investigators noted that Byrd had three "[v]ery small marks," "[l]ess than a centimeter" each, on his body—one in the area between his left index finger and middle finger and two in his "left chest area." The investigators testified that the marks were consistent with "scratches" from "fingernails" or "maybe the tip of a knife."

report the stabbing, indicating that the victim was on his way to the hospital.[4] However, Bowden was never transported to the hospital for treatment.

Byrd drove Malcolm, Carolyn, and Bowden directly to Cooper's house in Monroe, and when they arrived, Byrd pulled Bowden out of the car and left him face-down in the driveway close to the roadway. Byrd then drove to a relative's home to leave the Honda, and Tommy Roger and Crutchfield met the group there. Tommy Roger and Crutchfield took Carolyn to her son's house in Monroe and then drove Byrd and Malcolm back to Athens. Carolyn testified that she did not assist Bowden during this timeframe because she was "too afraid" of Byrd, and Byrd had threatened to kill her, too.

On May 8, 2020, Byrd was arrested for Bowden's murder. After being advised of his *Miranda*[5] rights, which Byrd agreed to waive, Byrd was interviewed by an investigator and a special agent with

---

[4] Crutchfield's 911 call was received by the Morgan County call center around 1:20 a.m. on May 4 and played for the jury at trial.

[5] See *Miranda v. Arizona*, 384 US 436 (1966).

the GBI.[6] During this interview, Byrd admitted that, during the argument with Bowden, Byrd retrieved a knife from his Honda, returned to the area near Tommy Roger's truck, and stabbed Bowden twice after he had run away and fallen on the ground. Byrd stated that he put the knife he used to stab Bowden in the closet of his Athens apartment, and later—pursuant to a search warrant—law enforcement officers collected this knife, among others, from the apartment.

Malcolm responded, "No, we just been girlfriend and boyfriend. We've been on and off relationship. And [Byrd] has just recent got out of prison." Byrd's trial counsel objected. Counsel for both parties approached the bench, and outside the hearing of the jury, the prosecutor explained, "I'm not offering that. I only meant to ask her how long they had been dating or fiancée." Byrd's trial counsel responded, "She ran wild. I'm going to have to make a motion for a mistrial. She's interjected his character into evidence. I'm not saying

---

[6] Byrd's custodial interview was audio- and video-recorded and played for the jury at trial.

it's the State's fault, but she just went off. And I'm not saying the State intentionally did anything, because … it took me a minute … for it to register."

The trial court excused the jury, and Byrd moved for a mistrial, arguing as follows:

> Malcolm … said "he had just got out of prison." The inference is, she was referring to Tommy Joe Byrd, and I objected at that point and we stopped the proceeding. By virtue of doing that she has impermissibly interjected the Defendant, Tommy Joe Byrd's, character in evidence … And, certainly, that he had just got out of prison indicates that, you know, he's done something and been in prison. Although it may be true, the jury's not supposed to hear that. So, I would respectfully ask the Court to grant us a mistrial in this case.

The State responded that Malcolm's mention of prison was non-responsive to the question asked, and the State requested that the trial court not "mistrial the whole case." The trial court advised that, while it understood Byrd had moved for a mistrial, it was inclined to do one of the following "at the Defendant's choice":

> I will just ignore it and we'll move forward with the rest of her testimony and not further highlight it, or I will, basically, give a charge that says; ladies and gentlemen of the jury, the last testimony given by the witness was

8

something to the effect that he had just got out of prison. I charge that you disregard that portion of the statement related to the Defendant's being in prison. Whether or not the Defendant's ever been in prison, is totally irrelevant here. You will not let that affect your judgment on these cases in any way, whatsoever. Simply put, that portion of her statement is out of your minds completely. I'll give that charge, or I'll … do nothing. And … I am concerned about that statement being made, but at this point in time, I … don't think that the Court is inclined to grant a mistrial. We can … always revisit that issue at a later time. But at this point in time I'm not so sure with the length of this testimony and everything else, … what effect that statement would have upon this jury.

Byrd's trial counsel indicated that Byrd would "stand by" his motion for mistrial and explained that he would "rather not have the Court give the curative instructions" because he did not want to "highlight it anymore." Trial counsel requested that the trial court simply "make a ruling" on the objection and "just sustain it and move on." The trial court agreed to do so. When the jury returned, the trial court ruled that Byrd's objection was sustained, and the last comment from Malcolm was "stricken from the record."

On appeal, Byrd contends that Malcolm's statement about his prior incarceration was improper character evidence, and the trial

9

court abused its discretion by refusing to grant Byrd a mistrial, "leaving the jury with the knowledge that Byrd was a convicted felon." We see no merit to this contention.

"Whether to grant a mistrial is within the sound discretion of the trial court and will not be disturbed on appeal unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial." *Swims v. State*, 307 Ga. 651, 654–55 (2020) (quotation marks omitted).

> Typically, a trial court's denial of a motion for mistrial based on the improper admission of bad character evidence is reviewed for abuse of discretion by examining factors and circumstances, including the nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety.

Id. at 655 (quotation marks omitted). And we have held that "a passing reference to a defendant's incarceration does not place his character in evidence," id. (quotation marks omitted); nor does "a nonresponsive answer that impacts negatively on a defendant's character … improperly place his character at issue." *Lewis v. State*, 287 Ga. 210, 212 (2010) (cleaned up).

Here, Malcolm's "passing" statement referencing Byrd's recent release from prison was an "unexpected answer" to the prosecutor's question about whether Malcolm and Byrd were married or planning to marry. See *Swims*, 307 Ga. at 655. Additionally, her answer was "brief and nonspecific," *Goins v. State*, 310 Ga. 199, 206 (2020)—it did not describe why Byrd was incarcerated or give any details about his criminal record. Moreover, after Byrd's counsel moved for a mistrial, "the trial court proposed the remedy of a curative instruction, but counsel did not accept the court's offer." Id. at 207 (noting that the failure to give "an unrequested curative instruction does not create reversible error" (quotation marks omitted)). And, after Byrd's mistrial motion was denied, the State did not inquire further about Byrd's criminal history or the reason for his incarceration, and the trial court ordered that Malcolm's statement be stricken from the record.

For these reasons, the trial court did not abuse its discretion in denying Byrd's motion for a mistrial. See *Swims*, 307 Ga. at 655 (concluding that the trial court did not abuse its discretion by

11

denying the defendant's mistrial motion after a witness briefly referenced the defendant's "incarceration in West Virginia for an unstated crime"). See also *Lewis*, 287 Ga. at 212 (holding that even if the prosecutor's questions at trial referenced the defendant's incarceration, the passing reference did not place his character in evidence, and the trial court did not abuse its discretion by denying his motion for a mistrial). Accordingly, this claim fails.

*Judgment affirmed. All the Justices concur.*